# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTICT OF MICHIGAN
## SOUTHERN DIVISION

Joseph Rowley, Jr.,

      Plaintiff,

          v.

Genesee County, Robert Winston,
David Scmeider, E. Martin,
S. Pritchard, Mangrim, Syzmitus,
Nukous, and Dobbs,

      Defendants.

_____/

Case No. 12-cv-15292
Hon. Judith E. Levy
Mag. Paul J. Komives

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [58]

This case alleges police misconduct. It arises out of a claim by plaintiff Joseph Rowley, Jr. ("Rowley") against defendants Genesee County, Robert Winston, David Schmieder, Elijah Martin, S. Pritchard, Mangrum, Brandon Szemites, Nuckolls, and Dobbs.[1] Defendant Schmieder was a lieutenant and defendant Nuckolls was a sergeant in

---

[1] Defendants Mangrum, Szemites, and Nuckolls' names were misspelled in plaintiff's complaint and case caption. The Court will not disturb the case caption, as plaintiff has not moved to correct the misspellings, however the Court will use the correct spelling of defendants' names in this opinion and order.

the Genesee County Sheriff's Department at all times relevant to this complaint.   The other individual defendants were Genesee County deputy sheriffs who were assigned to work in the jail.

Plaintiff brings claims against all defendants for (1) excessive use of force; (2) cruel and unusual punishment in violation of the Eighth Amendment; (3) assault and battery; and (4) gross negligence.  He also brings a claim against Genesee County for failure to train and supervise its officers, in violation of the Fourth and Fourteenth Amendments.

On March 24, 2014, all defendants filed a Motion for Partial Summary Judgment with respect to the following claims: (1) excessive use of force under the Eighth Amendment; (2) all claims against Genesee County; (3) all official capacity claims; (4) assault and battery against all defendants except Winston and Szemites; and (5) gross negligence.  Plaintiff responded to the motion, a reply was filed, and oral argument was held on July 15, 2014.  Upon questioning during oral argument the Court learned there was a video of one of the instances of alleged illegal conduct, and the parties were granted an opportunity to

submit the video along with a brief explanation of what they believe it shows.[2]

## I.     FACTS

Plaintiff alleges he was assaulted by officers in the Genesee County Sheriff's Department ("the County" or "the Department") on two separate occasions when he was lodged at the Genesee County Jail.  The first instance took place in December of 2010, and the second took place in September 2011.

## The December 2010 Incident

On December 3, 2010, plaintiff was being held in the Genesee County Jail on a warrant for failure to pay child support.  (Dkt. 58 at 8).  Plaintiff alleges that while he was in the process of being released, a female detainee in a nearby jail cell asked him if he was being released. Video evidence shows plaintiff standing by a jail cell for about two minutes before defendant Winston and another officer, coming from the opposite end of the hall, approached him.  (Dkt. 63-5 at 6).  Defendant Winston allegedly asked plaintiff what he was doing, and plaintiff

---

[2] In defendants' "brief explanation" regarding the video, they included an argument for qualified immunity for the first time.  The Court will not address this defense because defendants failed to raise it in their Motion for Partial Summary Judgment, and the supplemental briefing was to be limited to an explanation of the newly submitted video.

replied that he was being released.  According to plaintiff, defendant Winston responded: "No you're not.  Give me your coat, you're going back in your cell."  (Dkt. 63-3 at 19).

The video shows plaintiff talking with the two officers while a third officer walks down the hall towards plaintiff.  The video does not contain audio.  Plaintiff removes his coat and places it on the floor.  At this point, there are five officers standing in the hallway.  Plaintiff claims that defendant Winston ordered him to lie down on the floor and put his hands behind his back.  Plaintiff maintains that he was fully compliant with this order.  (Dkt. 63-3 at 19-20).  Defendant Winston claims that plaintiff was not compliant with any of his instructions, but acknowledges that plaintiff removed his shoes and jacket voluntarily. (Dkt. 63-5 at 7).

The video shows plaintiff turn to face the wall and the officer nearest to him (Winston) lunges at him, pushing him against the wall. Defendant Winston claims that he felt plaintiff "tense up" and "push[] back" when he attempted to guide him into the cell.  In order to get him to the ground, Winston testified that he "delivered a strike to [plaintiff's] left common peroneal," which is a nerve in the back of the

leg. (Dkt. 63-5 at 7). This is a strike officers are trained to use to restrain someone who is resisting their commands. (*Id.*).

The video shows that plaintiff was forced to the floor and landed on his face. Then three of the other officers restrained plaintiff at his head and feet while defendant Winston appears to kneel on top of plaintiff's back. Defendants Mangrum and Pritchard testified that they held plaintiff down on the ground while he was being handcuffed. (Dkt. 63-6 at 18; Dkt. 63-8 at 8). Defendant Martin also testified that he came into physical contact with plaintiff during this altercation. (Dkt. 63-7 at 9). Plaintiff alleges that while lying handcuffed face-down on the floor, Winston beat on the back of his head while kneeing him in the back causing his head to "split open on the hard concrete floor." (Dkt. 63-3 at 19-21). Defendants claim that plaintiff was resisting while on the floor by tightening his arms to make restraining him more difficult. While plaintiff was being restrained on the floor, a sixth officer walked down the hallway towards the melee.

A group of officers then lifted plaintiff up so that he was sitting in the middle of the hallway. The end of the video shows plaintiff sitting handcuffed with his pants around his ankles and blood on the left side

of his face and above his right eye.  Plaintiff also alleges that one of his teeth was knocked out as a result of the strikes to his head. (Dkt. 63-3 at 23).

Defendant Schmieder testified at his deposition that he was not in the vicinity at the time of the incident, but only reviewed reports of it after the fact.  This is consistent with video evidence showing only six officers in the area.  Defendants Winston, Martin, Pritchard, Mangrum, and Szemites all testified that they were present during this incident.  Plaintiff alleges that defendant Nuckolls was present as well, although Nuckolls disputed this fact when questioned during his deposition.

Plaintiff was examined by a nurse at the jail and it was determined that he needed to be taken to the hospital.  (Dkt. 63-7 at 10).  Defendants Dobbs and Szemites took plaintiff to Hurley Medical Center where he was treated for his injuries and received thirteen stitches.  (Dkt. 63-3 at 26; Dkt. 63-5 at 9).  After being treated at the hospital, plaintiff was transported and released into the community.  During this drive, defendants Dobbs and Szemites allegedly told plaintiff "not to worry about what happened at the jail, that Sergeant

Nuckolls said that Deputy Winston would be handled." (Dkt. 63-3 at 26).

## The September 2011 Incident

In September 2011, plaintiff was held at the same jail on a warrant for larceny. During this visit, plaintiff was on medication, which was administered by the jail nurse. All parties agree that when the nurse administered the medication, she asked plaintiff to show her that he had swallowed the pills. Plaintiff claims he opened his mouth for the nurse to see that he swallowed the medication; however, defendant Szemites testified that plaintiff did not lift his tongue, and defendant Dobbs testified that plaintiff opened his mouth, but only about "one finger" wide. The nurse then said, "Do I have to get Officer Dobbs to look in your mouth for you?" (Dkt 63-3 at 32; Dkt. 63-9 at 7;Dkt. 63-11 at 11).

Defendant Dobbs approached the area. Plaintiff testified that he opened his mouth for Dobbs and then began to walk away. Defendant Szemites asked plaintiff to return to show him that he had swallowed the pills, and then allegedly told plaintiff to return to his cell and "go lock up." Plaintiff responded by saying that if they wanted to lock him

7

up, they would have to take him to the restricted housing unit. Defendant Szemites allegedly said "If I got to take you to restricted housing unit I'm going to fuck you up worse than Winston did the first time." Defendant Szemites then allegedly knocked plaintiff down to the ground by swinging his arm at plaintiff's neck. When plaintiff was on the floor, he claims that Szemites stepped on his head with his boot, rendering him unconscious for a few seconds. (Dkt. 63-3 at 33-34).

Defendant Szemites claims that plaintiff was noncompliant with the nurse's request and was being aggressive, so Szemites called a "code green" and ordered plaintiff to the ground. A "code green," according to defendant Dobbs, is used to "respond to some type of hostile action in the jail… lets everybody else in the jail know that there's a disturbance, and that we need assistance." (Dkt. 63-11 at 12). Defendant Szemites testified that he saw plaintiff holding a pencil (plaintiff says he was only holding a cup) and used a "shoulder pin restraint" maneuver to restrain him. He states that as a result of plaintiff's continued resistance, the two of them fell to the ground. While attempting to get plaintiff's hands behind his back, Szemites struck plaintiff's shoulder with his knee or fist. (Dkt. 63-9 at 7-10). Defendant Dobbs similarly

8

testified that plaintiff was yelling at Szemites with a pencil in his hand while refusing to go to the lock up. He recalls that he called the code green in response to plaintiff's behavior. Defendant Dobbs testified that the entire physical altercation between plaintiff and Szemites lasted about ten to fifteen seconds. (Dkt. 63-11 at 12-14).

After he was handcuffed, plaintiff was again taken to the hospital and received stitches and a neck and back brace. (Dkt. 63-3 at 33). Plaintiff claims he has scarring above both of his eyes as a result of the two incidents at issue in this case. (Dkt. 63-3 at 22-23).

## Training & Supervision

Plaintiff alleges that officers with the Genesee County Sheriff's Department received insufficient training and supervision.

Defendants Nuckolls and Winston testified that it had been about four years since their last use-of-force training. (Dkt. 63-4 at 3-4; Dkt. 63-5 at 3-4). Winston testified that he was unaware whether his training included anything about protecting an inmate's safety when using non-lethal force. (Dkt. 63-5 at 8). Defendants Martin, Pritchard, and Dobbs testified that the only use of force training they received was at the corrections academy in 2009 (for Martin and Dobbs) and 2010 (for

Pritchard).  (Dkt. 63-7 at 4; Dkt. 63-8 at 3; Dkt 63-11 at 3).  Szemites testified that the use of force training in the Sheriff's Department was "sporadic" and that he last received such training around 2010.  (Dkt. 63-9 at 4).  Schmieder similarly described use of force training as periodic and testified that the last training he received was between 2006 and 2008.  (Dkt. 63-10 at 3).

With respect to supervision, defendant Nuckolls could not recall when he last received a performance review.  (Dkt. 63-4 at 3-4).  Defendant Winston said it had been about five years since he last received a performance review.  (Dkt. 63-5 at 3-4).  Winston noted, furthermore, that there had been a "cutting of supervision in the jail" which affected the frequency of performance reviews, which were supposed to occur on a yearly basis.  (*Id.* at 4).  Defendant Martin testified that he had only received one performance review in his 3-4 years with the Sheriff's Department.  (Dkt. 63-7 at 4).  Defendant Pritchard recalled that, as of February 2014, the last performance review he received was in 2010 or 2011, shortly after he joined the Department.  (Dkt. 63-8 at 3).  The last time defendant Szemites received a performance review was in 2008.  (Dkt. 63-9 at 4).

Defendant Mangrum, on the other hand, said he received use of force training and performance reviews once a year. (Dkt. 63-6 at 8-9). Defendants Schmieder and Dobbs also said they received performance reviews on an annual basis. (Dkt. 63-10 at 3; Dkt 63-11 at 3). Defendants testified that use of force reports are reviewed by a lieutenant to determine the appropriateness of the action. Defendant Schmieder testified that if any specific complaint of excessive force is received, that complaint would be further evaluated. He stated that the Department received no such complaint regarding either of the uses of force at issue in this case. (Dkt. 58-6 at 12-13).

Several of the individual defendants identified other allegations of excessive force that had been lodged against them. Defendant Nuckolls, for example, testified that he has been sued on multiple occasions for excessive force. (Dkt. 63-4 at 3-4). Defendant Szemites also testified that he had been the subject of about twenty complaints regarding use of force and treatment of inmates at the jail. (Dkt. 63-9 at 3-4).

## II.   STANDARD OF REVIEW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248. The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir.2002)).

## III.   ANALYSIS

Plaintiff's claims stem from two discrete uses of force in December 2010 and September 2011. For the sake of clarity, as there are several defendants incorporated into each of plaintiff's claims, the Court will briefly summarize each defendant's involvement with both use of force incidents.

With respect to the December 2010 use of force incident, defendants Winston, Mangrum, Pritchard, and Martin all testified that they came into physical contact with plaintiff. Defendant Szemites

testified that he was one of the officers in the hallway during this use of force, but no allegation has been made that he came into physical contact with plaintiff. Finally, plaintiff alleges that defendant Nuckolls was also nearby during this use of force, but Nuckolls disputes this fact.

With respect to the September 2011 incident, plaintiff alleges that only defendants Szemites and Dobbs were present during the use of force. Defendant Szemites testified that he used physical force to restrain the plaintiff, and defendant Dobbs testified that he was in the vicinity when this use of force occurred.

Defendant Schmieder testified that he was not in the vicinity of either use of force, and plaintiff has not made any such allegation in either his complaint or subsequent deposition testimony.

### A. Claims against Genesee County

*Federal Claims*

In a claim brought under 42 U.S.C. §1983 against a municipality, liability may be imposed only where a constitutional injury was caused by action taken "pursuant to official municipal policy of some nature." *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). Under *Monell*, a plaintiff must "identify the policy, connect the

policy to the [municipality] and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)).  Municipal liability need not be based on an explicitly articulated official policy:

> Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision making channels.

*Monell*, 536 U.S. at 690-91.

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court clarified this further, explaining that failure to train could constitute an official policy when it "evidences a deliberate indifference to the rights of its inhabitants." *Id*. at 389.  The Court explained:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a

policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390.

"A systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability." *Gregory v. City of Louisville,* 444 F.3d 725, 753 (6th Cir.2006) (citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)).   "Under a "failure to train" theory of municipal liability, plaintiff must show that (1) a training program is inadequate to the tasks that the officers must perform; (2) the inadequacy is the result of the municipality's deliberate indifference; and (3) the inadequacy is closely related to or actually caused the plaintiff's injury.  *Plinton v. Cnty. of Summit,* 540 F.3d 459, 464 (6th Cir.2008) (citing *City of Canton,* 489 U.S. at 389–91) (internal quotation marks omitted).

"[D]eliberate indifference can be demonstrated in two ways: through evidence of prior instances of unconstitutional conduct demonstrating that the municipality had notice that the training was deficient and likely to cause injury but ignored it, *or* through evidence of a single violation of federal rights, accompanied by a showing that the municipality had failed to train its employees to handle recurring

situations presenting an obvious potential for such a violation." *Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 942 (M.D. Tenn. 2012) (citing *Harvey v. Campbell Cnty., Tenn.*, 453 Fed. Appx. 557, 562-63 (6th Cir. 2011)) (emphasis added).

The first question is whether plaintiff has offered sufficient evidence to raise a genuine issue of material fact that the use of force training by the Genesee County Sherriff's Department was constitutionally inadequate. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) (holding that a plaintiff had provided sufficient evidence to show that a municipality's use of force training with respect to individuals with mental disabilities was constitutionally inadequate). Plaintiff contends, and testimony from several defendants shows, that the Department does not have a system to ensure regular training on use of force. Defendant Nuckolls indicated that it had been about four years since he received use of force training; Szemites testified that he received training at some point in 2010; Winston said it had been four-six years; and Martin, Pritchard, and Dobbs said they had received no such training since leaving the training academy. (Dkt. 63 at 15-18).

Plaintiff also argues that the County is liable due to its failure to supervise. Failure to supervise, as with failure to train, triggers municipal liability where "the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the [municipality] as an entity can be held liable." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989). Defendant Szemites was present during the 2010 incident, yet received no subsequent performance evaluation. Indeed, Szemites says he has not received a performance evaluation since 2008. Defendant Winston testified that supervision at the Department has been cut significantly, which led to a decrease in the frequency of performance evaluations. In defendant Nuckolls' case, he could not recall whether he had *ever* received such an evaluation. While there are many ways to provide supervision in a law enforcement agency, conducting performance reviews provides the employer with an opportunity to communicate with officers about whether their conduct meets the minimum standards set forth by the Constitution.

With respect to the December 2010 incident, the Court finds that plaintiff has raised a material question of fact as to the adequacy of

training regarding the use of force when handling "recurring situations presenting an obvious potential for" violations of the constitutional rights of detainees such as plaintiff. The interaction with plaintiff in December 2010 is precisely the sort of incident that it likely to repeat itself and that officers should be trained to respond to. Viewing the evidence regarding training in the light most favorable to plaintiff, a reasonable jury could find that defendants' training was unconstitutionally deficient.

Indeed, the December 2010 incident is the kind of recurring event that the court in *Okolo* addresses when noting that "a single violation of federal rights" paired with a failure to train may trigger municipal liability. *See Okolo* 892 F. Supp. at 942. Nonetheless, the County failed to provide any additional training to the officers present during the December 2010 use of force, and two years later one of the same officers, defendant Szemites, used what a reasonable juror could find to be excessive force against the same individual.[3] Accordingly, with respect

---

[3] Plaintiff, furthermore, provides evidence of a history of complaints against defendant Nuckolls. Defendants Nuckolls and Szemites also admit that they have received several complaints (about 20 for Szemites) regarding their use of force. (Dkt. 63-4 at 3-4; Dkt. 63-9 at 3-4). These are complaints the County received, and depending on the nature of the complaints, could also have put the County on notice that its deputies needed additional use of force training. *See Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997) (noting that Canton "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to

to the September 2011 incident, plaintiff has raised a material question of fact as to whether the first incident put the County on notice that the officers involved in that incident, defendants Winston, Mangrum, Pritchard, Martin, Szemites, and Nuckolls, needed further training and supervision on the use of force.

*State Law Claims against Genesee County*

Plaintiff concedes that these claims against defendant Genesee County cannot be sustained. (Dkt. 63 at 24). Accordingly, the Court will grant summary judgment for defendant Genesee County on all of the state claims, which include Count III (assault and battery) and Count IV (gross negligence).

## B. Plaintiff's Official Capacity Claims

In plaintiff's official capacity claims, he is seeking damages not from the individual officers, but from Genesee County where the individual defendants are employed. The Supreme Court has held that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Court, therefore, will treat the claims against all

---

train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.").

of the officers in their official capacity under the *Monell* analysis set forth above as these claims "represent only another way of pleading an action against an entity of which an officer is an agent." *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (quoting *Mattews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994)).

Accordingly, for the reasons set forth above, the Court will deny summary judgment for all of the officers in their official capacity who were present during the alleged uses of force. With respect to the December 2010 incident, the Court will permit the lawsuit to proceed against defendants Winston, Mangrum, Pritchard, Martin, and Szemites in their official capacity as they all testified that they were present and/or came into physical contact with plaintiff during the alleged use of force. In viewing the facts in the light most favorable to plaintiff, the Court will also allow the official capacity suit to proceed against defendant Nuckolls as (1) plaintiff alleges he was present during the incident; and (2) video evidence shows six officers. The Court will grant summary judgment for defendant Dobbs with respect to the December 2010, as plaintiff has not alleged he was present and Dobbs testified that he was dealing with another inmate 25 yards away.

With respect to the September 2011 alleged use of excessive force, the Court will grant summary judgment for all defendants in their official capacity aside from those two who testified that they were present during the use of force – defendants Szemites and Dobbs.

The Court will grant summary judgment for defendant Schmieder in his official capacity as there is no evidence that he was present during either incident giving rise to this lawsuit.

## C. Assault and Battery Claims Against Defendants Other Than Winston and Szemites

"A battery is the wilful and harmful or offensive touching of another person which results from an act intended to cause such contact." *Espinoza v. Thomas*, 189 Mich. App. 110, 119 () (citing *Tinkler v. Richter*, 295 Mich. 396, 401 (1940)). An assault is the "unlawful offer of corporal injury to another by force, or force unlawfully directed toward the person of another, under such circumstances as create a well founded fear of imminent peril" combined with the likelihood of such force occurring if not prevented. *Tinkler*, 295 Mich. At 401.

Defendants argue that only two of the defendants (Winston and Szemites) were alleged to have come into physical contact with the plaintiff. (Dkt. 58 at 18). Although plaintiff testified that he does not

21

know whether anyone other than defendants Winston and Szemites came into physical contact with him, defendants Mangrum, Pritchard, and Martin each testified that they came into physical contact with plaintiff during the December 2010 incident. (Dkt. 63-6 at 18; Dkt. 63-7 at 9; Dkt. 63-8 at 8). Accordingly, as to defendants Mangrum, Pritchard, and Martin, there remains a material fact in dispute with respect to whether they committed assault and battery against plaintiff during the December 2010 incident.

For the rest of the defendants (Nuckolls, Dobbs, and Schmeider), however, there is no allegation of physical contact with plaintiff, that they requested or encouraged the physical contact, or that plaintiff feared imminent physical contact by these defendants. Plaintiff merely provides the definition of assault and battery and concludes that "defendants are clearly liable." (Dkt. 63 at 24-25). This, on its own, is not enough to find them liable for assault and battery.

Accordingly, summary judgment on the assault and battery claims will be granted for defendants Nuckolls, Martin, Dobbs, and Schmeider. The claims against defendants Winston, Szemites,

Mangrum, and Pritchard will stand and summary judgment as to these deputies is denied.

### D. Plaintiff's Gross Negligence Claim

*Defendant Schmieder*

The Court will grant summary judgment for Defendant Schmieder and dismiss the negligence charges against him as plaintiff has provided no evidence that he was at the scene of either the December 2010 or September 2011 incidents.

*Intentional Tort Defendants*

Michigan courts have held that claims involving elements of intentional torts cannot also support a claim of negligence. *VanVourous v. Burmeister*, 262 Mich. App. 467, 483-84 (2004) ("[t]his Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.") Since the claims against defendants Winston, Szemites, Mangrum, and Pritchard are based on alleged intentional assaultive conduct, plaintiff cannot support a gross negligence claim.

Accordingly, plaintiff's allegations of gross negligence against Winston, Szemites, Mangrum, Pritchard, and Martin are dismissed.

*Duty of Officers to Protect Inmates*

Defendants contend that the rest of the officers cannot be held liable for gross negligence because "there is no duty owed by law enforcement for failing to protect an individual from the criminal acts of a third party." (Dkt. 58 at 20-21). Michigan courts have held that officers are immune from tort liability "for the negligent failure to provide police protection unless an individual plaintiff satisfies the special-relationship exception." *White v. Beasley*, 453 Mich. 308, 316 (1996).

The question, therefore, is whether a special relationship exists between officers at a county jail and the people in their custody. In *Philpott v. City of Portage*, 2006 WL 2385316 (W.D. Mich. Aug. 17, 2006), the plaintiff alleged gross negligence because her handcuffs were too tight and the officers in close proximity to her did nothing despite her complaints. *Id.* The court denied defendant's motion for summary judgment in regards to plaintiff's gross negligence claims against the officer. *Id.* In *Wells v. City of Dearborn Heights*, 538 Fed.App'x. 631 (6th Cir. 2013), the Sixth Circuit explained that *Philpott* stood for the proposition that a negligence claim could be maintained against an

officer for failing to intervene "on behalf of an arrestee being subject to excessive force." *Wells*, 538 Fed. App'x at 642.

Defendants rely on *Chivas v. Koehler*, 182 Mich. App. 467 (1990), to argue that no special relationship and no duty to intervene exists in this case. Defendants' reliance on *Chivas* is misplaced as the facts are clearly distinguishable from the matter currently before the Court. In *Chivas*, guards at a prison were sued when prisoners escaped and subsequently killed a police officer in the community. *Id.* at 469-70. In making the determination that the guards did not owe a duty to the police officer, the court looked at a variety of factors – "the societal interests involved, the severity of the risk, the burden upon the defendant, the likelihood of occurrence, and the relationship between the parties" – in determining whether a special relationship existed between the victim and the person causing the injury. *Id.* at 475 (citing *Sierocki v. Hieber*, 168 Mich. App. 329, 433 (1988)). The court then concluded that there was no special relationship between the guards and the escaped prisoners that would impose some additional duty akin to a psychiatrist who becomes aware of a patient posing risk to a third party. *Id.* at 475. The holding in *Chivas* does not stand for the premise

that there is not a special relationship between guards and the general prison population. Indeed, applying the factors laid out in *Chivas*, this Court finds that a special relationship exists between jailers and detainees in their custody such that they have a duty to intervene if they see that an inmate is being harmed due to the conduct of another officer. *See id* at 475.

The next question is whether defendants Szemites and Nuckolls (in December 2010) and defendant Dobbs (in September 2011) acted unreasonably in failing to intervene. In *Wells*, for example, the Sixth Circuit upheld a district court's finding that an officer's failure to respond was reasonable under the circumstances where the excessive force only lasted a few seconds. *Wells*, 538 Fed. App'x at at 642 (affirming *Wells v. City of Dearborn Heights*, 2011 WL 6740743 at *8). In *Philpott*, on the other hand, the plaintiff was complaining about handcuffs causing her pain for a significant period of time. *Philpott*, 2006 WL at *1. The facts here fall between these two factual situations. The uses of force at issue before the Court are not like the use of a taser that is over within seconds. The December 2010 use of

force lasted approximately 40 seconds, and the September 2011 use of force lasted at least 10-15 seconds.[4]

Accordingly, a reasonable jury could find that defendants Nuckolls and Szemites (in December 2010), and defendant Dobbs (in September 2011), failed to act reasonably when they did not act to prevent or limit the use of force.

*Proximate Cause*

Defendants argue that, even if they acted unreasonably, any negligent actions could not be the proximate cause of plaintiff's injury because the most direct cause was the actual physical assault. Michigan courts have held that to be the proximate cause of the injury, defendants' acts alone must have been "the most immediate efficient and direct cause preceding plaintiff's injury." *Oliver v. Smith*, 290 Mich. App. 678, 686 (2010).

The issue of proximate cause is typically a question of fact for the jury. *See Helmus v. Dep't of Transp.* 238 Mich. App. 250, 256 (1999). Only when the facts are not disputed and when reasonable minds could not differ is proximate cause a question of law for the

---

[4] The only evidence the Court has on the length of the September 2011 use of force is defendant Dobbs' testimony that it lasted about 10-15 seconds.

court. *See Robinson v. Detroit*, 462 Mich. 439, 463 (2000). In *Philpott,* the court concluded that, although not the direct cause of the harm, officers who heard complaints about the tightness of handcuffs could be the proximate cause of plaintiff's injuries. *Philpott*, 2006 WL at *7 (finding that an officer's failure to loosen handcuffs could be the proximate cause of an injury even if that officer was not the person who came into physical contact with the arrestee). In *Leverette v. Genesee County*, 2014 WL 2558655 (E.D. Mich. June 6, 2014), the court found that a defendant officer could be the proximate cause of an injury caused by other officers engaging in excessive force. *Id.* at *23 (citing *Wells*, 538 F. App'x at 643; *Smith v. County of Lenawee,* 600 F.3d 686, 692 (6th Cir. 2010)) (recognizing but distinguishing *Philpott* where the defendant officer was not an employee of the defendant county and had been only peripherally involved in plaintiff's care).

Defendants, similarly, have failed to address in any meaningful way defendants Szemites and Nuckolls (in December 2010) and defendant Dobbs' (in September 2011) alleged failure to put a stop to the use of force. Accordingly, viewing the evidence in the light most favorable to plaintiff, the Court will deny defendants Szemites,

Nuckolls, and Dobbs' motion for summary judgment on plaintiff's gross negligence claim based on defendants' failure to intervene.

### E.   Stipulated Dismissals

Defendants argue that rights under the Eighth Amendment cannot be asserted until after conviction and sentencing. *Graham v. Connor*, 490 U.S. 386, 393 n.6 (1989) (citing *Ingraham v. Wright*, 430 U.S. 651 (1977)).  At oral argument plaintiff's counsel concurred in this analysis. Accordingly, the Court will grant summary judgment for all defendants on plaintiff's Eighth Amendment claim.

## IV.   CONCLUSION

Accordingly, IT IS HEREBY ORDERED:

Defendants' Motion for Summary Judgment on plaintiff's Eighth Amendment claim is GRANTED with respect to all defendants, and Count II of plaintiff's complaint is DISMISSED with PREJUDICE.

Defendant Genesee County's Motion for Summary Judgment on plaintiff's constitutional claims against Genesee County (Count V) is DENIED.

**Count I - Excessive Force:**

i)  December 2010 incident

(1) Defendants Schmieder, Dobbs, and Genesee County's Motion for Summary Judgment is GRANTED;

(2) Defendants Winston, Szemites, Mangrum, Pritchard, Nuckolls, and Martin's Motion for Summary Judgment is DENIED.

ii) September 2011 incident

(1) Defendants Schmieder, Winston, Mangrum, Pritchard, Nuckolls, and Martin's Motion for Summary Judgment is GRANTED;

(2) Defendants Szemites, Dobbs, and Genesee County's Motion for Summary Judgment is DENIED.

## Count III - Assault and Battery:

i) December 2010 incident

(1) Defendants Genesee County, Szemites, Schmieder, Nuckolls, and Dobbs' Motion for Summary Judgment is GRANTED;

(2) Defendants Mangrum, Pritchard, and Martin's Motion for Summary Judgment is DENIED.

ii) September 2011 incident

(1) Defendants Genesee County, Winston, Mangrum, Pritchard, Schmieder, Nuckolls, Dobbs, and Martin's Motion for Summary Judgment is GRANTED.

## Count IV – Gross Negligence

i)  December 2010 incident

(1) Defendants Genesee County, Winston, Mangrum, Pritchard, Schmieder, Nuckolls, and Martin's Motion for Summary Judgment is GRANTED;

(2) Defendants Szemites and Nuckolls' Motion for Summary Judgment is DENIED.

ii) September 2011 incident

(1) Defendants Genesee County, Winston, Mangrum, Pritchard, Schmieder, Szemites, Nuckolls, and Martin's Motion for Summary Judgment is GRANTED.

(2) Defendant Dobbs' Motion for Summary Judgment is DENIED.

With respect to claims of constitutional violations that have survived this motion for summary judgment, plaintiff's claims against

the remaining individual defendants in their official capacity shall proceed.

Dated: October 16, 2014
Ann Arbor, Michigan

s/Judith E. Levy_____
JUDITH E. LEVY
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 16, 2014.

s/Felicia M. Moses_____
FELICIA M. MOSES
Case Manager